MATTER OF SS. CAPTAIN DEMOSTHENES

In Fine Proceedings

LOS–10/2.283

*Decided by Board July 11, 1969*

(1) Liability to fine does not lie under section 254(a)(2) of the Immigration and Nationality Act for failure to detain on board two alien crewmen denied conditional landing privileges who were apprehended while attempting to swim ashore from the vessel, since, within the meaning of section 254, they did not effect a landing, the element essential to establish a violation of that section.

(2) Where reasonable precautions were taken by the responsible parties, a vessel's unduly prolonged port call because of the necessity for extensive repairs warrants a more generous mitigation of the fine arising under section 254 of the Act than in the usual case.

IN RE: SS. *CAPTAIN DEMOSTHENES*, which arrived at the port of Los Angeles, California, from foreign via another United States port, on August 25, 1968. Alien crewmen involved: Nicolaos Buras, Georgios Cavril, Constantinos Koumoutsos and Dimitrios Kefalinso

BASIS FOR FINES: Act of 1952—Section 254(a)(2) [8 U.S.C. 1284].

ON BEHALF OF APPELLANT:  Michael D. Dempsey, Esquire
600 South Spring Street
Los Angeles, California 90014

The District Director at Los Angeles, in a decision dated April 10, 1969, held that W. H. Wickersham & Co., as agents for the vessel, had incurred liability to administrative penalties of $4,000, $1,000 as to each of the alien crewmen named above, for failure to detain them aboard the vessel at all times despite the fact that they had not been granted conditional landing privileges. However, the District Director found present herein factors which, in his opinion, merited mitigation of the fines to the extent of $2,000, $600 as to each of the first two crewmen named above, and $400 as to each of the other two crewmen. Thus, he permitted to stand herein a penalty of $2,000, $400 as to each of the first two named crewmen and $600 as to each of the other two crewmen.

It appears from the record before us that the following material facts exist without substantial controversy. The vessel made its first United States port call on this trip at Baltimore, Maryland, on August 1, 1968. Immigration inspection, which was then and there accorded its crew, resulted in the refusal of conditional landing privileges to ten alien members of the crew, Greek nationals, including the four named above. They remained aboard the vessel at all times while it was in the port of Baltimore.

The vessel cleared Baltimore bound for the Far East. After transiting the Canal Zone, the crankshaft for the main engines broke and the vessel put into the port of Los Angeles on August 25, 1968, for extensive repairs. It remained in that port for approximately four months thereafter.

On the night of November 17, 1968, while the vessel was anchored just within the breakwater marking the boundary of Los Angeles harbor, the crewmen Nicholaos Buras and Georgios Cavril attempted to swim ashore from the vessel. They were apprehended before reaching land by local police, turned over to immigration officers, placed under deportation proceedings and deported to Greece.

On December 3, 1968, the vessel then being at dock side, the crewman Constantinos Koumoutsos left the ship and made his way ashore in the United States. At the time the District Director considered the case, he was still at large in this country. However, information has now been received by this Board that he was eventually apprehended by immigration authorities in Boston, Massachusetts, and deported to Greece at the expense of the vessel's owners.[1]

On December 8, 1968, the crewman Dimitrios Kefalinso succeeded in leaving the ship and making his way ashore in the United States. Insofar as the record shows, he is still at large in this country. The only additional comment required in this connection is that professional guards were on duty at all times at the gangway while the vessel was at dock side, but it was riding low in the water so that anyone could step from the ship to the pier, and there was a heavy fog on the night he escaped.

On the basis of the foregoing facts, we conclude that the Dis-

[1] Ordinarily, we would remand the case to have this information introduced into evidence and considered by the District Director, but we will not do so here because of the unavoidable administrative delay involved; because the authenticity of the information does not appear to be subject to question; and because the present posture of the case calls for final resolution of all aspects of the problems presented, at one and the same time.

346

trict Director has improperly order fines imposed as to the crewmen Nicolaos Buras and Georgios Cavril who were taken into custody by local police while attempting to swim ashore and therafter given over into the custody of immigration officers and made the subject of deportation proceedings. The reason is that we do not think it can logically be held that they effected a "landing," which is the element essential to establish a violation of this section of the law.[2]

Judicial decisions indicate that the term "landing" is a word of art. The Supreme Court of the United States has defined it thus: " 'to land' means to go ashore" and " 'landing from such vessel' takes place and is complete the moment the vessel is left and the shore is reached." [3] This language was later quoted verbatim by the Court of Appeals for the Ninth Circuit.[4]

We were called upon to apply the foregoing definition in a somewhat similar situation involved in the case of *Adorno Dubbiosi, Boatswain ex SS "Enrico."*, NOR–87, BIA, 5/13/59, unreported. Therein, an alien serving as boatswain abroad a vessel was charged with liability to fine under section 271 (a) of the Immigration and Nationality Act (8 U.S.C. 1321) for failure to prevent the "landing" of four other aliens whom he had assisted to stowaway aboard the vessel in Italy, and whom he had concealed throughout the trip to the United States. On the vessel's arrival in the United States, Service officers discovered the stowaways just as they were ready to go ashore. Said officers then took the stowaways and the boatswain into custody and ashore for possible criminal prosecution. In the light of the foregoing judicial definition of the term "landing," and in view of the penal nature of this statute requiring for it strict construction in all respects,[5] we held that no "landing" was effected. We so hold here, finding no valid reason to do otherwise.

With respect to the foregoing, the United States District Court for the Eastern District of Virginia, Norfolk Division, ruled to the same effect in connection with the question of whether the alien boatswain involved in the case before us had made an "entry," holding he should have been made the subject of exclusion proceedings rather than the expulsion proceedings which the Service had brought against him.[6] All we can add, in this connec-

---

[2] *The Kathlambra*, D.C. N.Y., 1926, 18 F.2d 113.

[3] *Taylor v. United States*, 207 U.S. 120 (1907).

[4] *Niven v. United States*, 169 Fed. 782 (1909).

[5] *Miller v. Robertson*, 366 U.S. 243 (1924).

[6] *In re Dubbiosi*, 191 F. Supp. 65 (1961).

tion, is that it is immaterial from the fine liability standpoint that it may not have been the efforts of the parties responsible for the vessel's operation which prevented the crewman from effecting a landing in the United States for the reason that the landing is the essence of the violation and without it there can be no fine.[7]

As to the other two crewmen, the District Director's opinion reflects that the parties responsible for the vessel's operation exerted diligent efforts to keep them on board. Professional guards were hired and on duty at all times while the vessel was at dock side. Their seaman's documents were lifted and made available to the Service after their escape. The fact that they had left the ship was reported to the Service with reasonable promptness.

Ordinarily, under these circumstances we would be inclined to view as adequate the mitigation ($400) already authorized by the District Director as to these two crewmen. However, it appears in this instance that the vessel's port call was unduly prolonged because of the necessity for extensive repairs. Obviously, this complicated the ordinary difficulties of detaining the crewmen on board. In such situations, we have consistently held that more generous mitigation is warranted than in the usual case, provided reasonable precautions were taken by the responsible parties, as they were here. And, as we have already pointed out herein, one of the two remaining detainees was subsequently removed from the United States by and at the expense of the parties responsible for the vessel's operation. Accordingly, we will reduce the penalty to the statutory minimum of $200 as to him, and reduce the penalty as to the other detainee by an additional $200.

**ORDER:** It is ordered that the appeal be sustained insofar as the crewmen Buras and Carril are concerned, and that no fines be imposed on to them.

*It is further ordered* that the District Director's decision be otherwise amended to provide for $200 more mitigation as to the crewman Kefalinso and $400 more mitigation as to the crewman Koumoutsos, and that as so modified the decision of said official be and the same is hereby affirmed.

*It is further ordered* that the penalty permitted to stand in this case be $600, $400 as to the crewman Kefalinso and $200 as to the crewman Koumoutsos.

---

[7] See *Matter of SS "Belina,"* NOR–10/33.103, BIA, 1960, 9 I. & N. Dec. 2.

section 349(a)(2) of the Act as it was a concomittant of his non-expatriating marching and not a separate and distinct act.[5]

**ORDER:** It is ordered that no change be made in the order of the special inquiry officer and that the applicant be admitted to the United States as a United States ciizen.

---

[5] *Matter of V—L—*, 5 I. & N. Dec. 497 (BIA, 1953); *Moldoveanu v. Dulles*, 168 F. Supp. 1 (E.D. Mich., 1958).